Joining us through video conference for this argument session. The court will hear four cases for argument this afternoon as listed on the calendar. Madam Clerk, would you please call the first case for argument? The first case for argument is 19-2199 Western Missouri and 19-2242 Western Missouri, Bryce Masters v. Timothy Runnels. Very well. Mr. Cutler, we'll hear from you first. Thank you, your honor. May it please the court. Well, hold on just a second. We might have lost Judge Malloy. We did lose Judge Malloy. Why don't you hold Mr. Cutler until we see if Judge Malloy reconnects. Here we go. I think he's back. Yeah, I was trying to get Judge Cutler on my screen here. I couldn't for some reason either, but we can go ahead. I can see everybody else, so that's fine. All right, and I did something while trying to get her on, so operator error. All right, Mr. Cutler, we'll hear from you first. Thank you, your honor. I represent the defendant appellant in this matter, former police officer Timothy Runnels. This is the case where during a traffic stop, the plaintiff refused to comply with officer Runnels' directives, was resisting arrest, and was tased. Plaintiff claims a violation of his fourth amendment rights. We've appealed three issues in this case. The first issue was whether officer Runnels is entitled to qualified immunity for the tasing, and our position is that he absolutely is entitled to it. This is exactly the kind of case for which qualified immunity was intended to apply. It was a rapidly evolving police encounter. The taser application did not incapacitate the plaintiff like it was supposed to, such that there was no bright line between resisting arrest and no longer resisting arrest. Based on a circuit case law, as of September 2014 when this incident happened, a reasonable officer on the scene would have believed, as officer Runnels did, that he was legally permitted to use his taser in the manner that officer Runnels used his. If that belief was incorrect, however, then qualified immunity protects officer Runnels from liability. Our second ground for appeal is the erroneous admission into evidence of the opinions of the vocational rehabilitation expert that plaintiff engaged regarding plaintiff's ability to go to college and his prospects for jobs thereafter. The case law is clear that the medical evidence. Here the voc rehab expert admitted that his conclusions about plaintiff's future limitations were not based on any medical opinions rendered in the case or on plaintiff's medical records. Therefore, such testimony was inadmissible under the law. And our third and final ground for appeal is the admission of the opinions of plaintiff's expert economists regarding plaintiff's diminished future earning capacity. Because the economist's opinions were inadmissible assumptions of the voc rehab expert, under the law, the economist's opinions are likewise inadmissible. That's a summary of the issues that we've appealed. If it pleases the court, I would like to start with the first point, which is the issue of qualified immunity. Qualified immunity, and I'd like to just highlight three quick points for the court regarding qualified immunity. Qualified immunity is a default position. It applies unless there's some reason for it not to. It's not something an officer has to apply for. It's not something that an officer has to work to earn. It applies unless the officer does something that takes him out of the ambit of qualified immunity. This court said it shields all conduct except for the plainly officer. In order for an officer to come out of the protection of qualified immunity, his conduct has to fall into one of those two categories, incompetent or normally violating the law. In this case, Officer Runnels falls into neither category. The Independence Police Department conducted an investigation of Officer Runnels' use of the taser and found that it was within policy. So he was not incompetent, and he did not normally violate the law, and he did nothing to take out of the protection of qualified immunity. Therefore, it should apply. The second point about qualified immunity is that there are no bright lines here. To take himself out of qualified immunity, an officer has to cross a bright line. This court has held that officers are not liable for transgressions in gray areas. They're liable for transgressions across bright lines, and this case was the very definition of a gray area. The taser did not incapacitate the plaintiff. There was no clear indication that the plaintiff, who had been resisting arrest, was no longer resisting arrest, as he claims. This court's 2017 decision in Jose v. City of St. Paul gives us real insight into this court's gray areas. In that case, after initially resisting arrest, the plaintiff decided to get on the ground. He put one knee on the ground and one hand on the ground, at which time an officer jumped on his back and forced him to the ground, and he claimed a violation of his Fourth Amendment rights. This court found that qualified immunity applied in that situation and held that a reasonable officer on the scene could have believed that Jose was passively resistant even after he began to lower himself to the ground. Now, that's crucial because in this case, in our case, the plaintiff claims that the tasing should have stopped once he began to lower himself to the ground, but this court found in the Jose case that it was reasonable for an officer to use force after that point because the officer had no way of knowing whether it was passive What I understand to be a five-second cycle of the taser, because as I understand it, if the facts presented themselves at trial, he had held the trigger down through the entire 20 seconds, is that correct? That's correct, your honor. And so how do we factor in what I also understand the testimony to be, that a single pull of the trigger would be five seconds, so it could be divided into distinct impositions of force through the taser? Well, in this particular case, the plaintiff did not respond the way someone normally responds when they're tased. When a person is normally tased, their body locks up. They drop to the ground, they're incapacitated, which is a signal to the officer that the taser has worked. And so, yes, an officer would think, after the initial application, I can release the taser and effectuate the arrest. In this particular case, that didn't happen. The plaintiff was not incapacitated by the taser. He was able to get out of his car from a seated position to stand to a rising position outside of his car there in front of Officer Runnels. And so there was no way for Officer Runnels to think that five seconds would be enough to respond in a way that Officer Runnels was trained as someone who was tased would respond. The second point on qualified immunity I'd like to highlight for the court is that it has not been clearly established, sorry, the third point, excuse me, it has not been clearly established in the Eighth Circuit that how long an officer can tase a suspect who is resisting arrest. There is no law, there's no rule, there's no regulation that 20 seconds per se is excessive. And the Eighth Circuit has never ruled on this issue. And so in September of 2014, it was not established in the Eighth Circuit how long an officer can tase a suspect who is resisting arrest. And in the absence of clear precedent showing that his conduct was unreasonable, Officer Runnels is entitled to giving him that notice in September of 2014. Now, we do acknowledge that it is not required that there be a case directly on point. But general propositions of the law are not sufficient. Just last year in the case of Swearingen v. Judd, this court held that the clearly established law must be particularized to the facts of the case and not defined at a high level of generality. And the dispositive question is whether the violative nature of the particular conduct is clearly established. And here, there was no notice as of September 2014 to Officer Runnels that his use of the taser and the manner in which he used it was violative of the plaintiff's constitutional rights. Mr. Cutler? Yes, sir. In your addendum, you excerpt this statement from Judge Fenner before the case was submitted to the jury, where the judge says, I believe it is not clearly established under the law that there's a period of time for which a taser can be deployed after a subject resists arrest. And that's really what we're dealing with as a legal question and a case. But then he goes ahead and says, all that being said, my inclination is to submit the case to the jury in accordance with the instructions. And he quotes or refers, I think, to probably number 13. What's your understanding of that colloquy? What was the judge submitting if he believed it was not clearly established that there's a period of time for which a taser can be deployed after a subject resists arrest? Your Honor, I don't know what Judge Fenner was thinking other than what's reflected in the record. We had discussions about the application of qualified immunity. We presented the same arguments to him that we're presenting to you. And I included that colloquy because it appeared that the judge was ready to follow the law. And so at some point, I don't know why he chose not to, but he did not follow the law. And that has formed the basis of this appeal. I don't know why he submitted it to the jury or what his rationale was. What's your understanding of instruction number 13, which is the one about... Are you familiar with that one? Yes, I'm looking at it now. I'm sorry. When you say what's my understanding of it, it's an affirmative defense instruction, but I'm not sure I understand your question. When it refers to resistance as the taser is deployed, I think is the wording. Yes, sir. Do you think that was that designed to tell the jury to look at the entire period of taser deployment? No, sir, I don't. Because the way the case was tried in the plaintiff's theory of the case was that the plaintiff was not disputing the first five seconds of the taser deployment. The plaintiff's claim of excessive force is related to the last 15 seconds. Now, we objected to that because you can't really dissect this encounter in discrete time segments like that. It was rapidly evolving, spur of the moment kind of thing. Going back to the instruction, when it says, if you find that Reynolds had a reasonable belief that Bryce Masters was actively resisting arrest as the taser was discharged, your verdict must be in favor of Reynolds. Was that telling the jury that they needed to find active resistance throughout the entire 20 seconds in order to find for Reynolds? Was that the idea? I don't think so, your honor, because it uses the phrase as the taser was discharged, and I can see that's ambiguous because it could mean as the moment the taser was discharged, or it could mean during the time the taser was discharged. I do see that ambiguity that the court is raising. I wondered if, in light of this colloquy that we were talking about, whether the judge was submitting the question whether Reynolds, I mean, Masters resisted at all at the very beginning, or whether he was submitting the question whether Masters resisted throughout the discharge. If it was undisputed that he resisted at the beginning, then I don't know why the judge would have submitted that. Anyway, if you have anything to add on that. The only thing I can add, your honor, is that I think it was undisputed that Bryce Masters was resisting arrest at the time the taser was initially discharged, and I think that's why plaintiff is not challenging the first five seconds of the taser discharge. That's the only I can add with respect to the instruction. Well, then does that mean the jury found that Masters was not resisting during the last 15, or at least at some point during the last 15? I would have to say yes, because that is what the plaintiff argued. All right, okay. So then the question on qualified immunity is whether the law was clearly established that an officer was forbidden to continue the taser deployment if the subject ceased resistance. Not quite, your honor. No, all right. What is it then? Because there's no way for an officer to know in this circumstance that Bryce Masters had in his mind ceased resistance. In a normal taser situation when the suspect is incapacitated, the suspect's body drops, locks up, and if he resumes his activity, that's easy because there's a clear demarcation between incapacitation and then resuming resistance. In this case, because the taser application was not effective, there was no market change in Bryce Masters' behavior such that it would have been clear to a reasonable officer or to Officer Reynolds that Bryce Masters was no longer resisting. But isn't that a factual finding that the jury made? I mean, I think you could look at that videotape and after Mr. Masters was already laying on the ground, Officer Reynolds continued to tase him. I mean, couldn't a jury look at that and say it would be clear to any reasonable officer he was no longer resisting when he's laying basically unconscious on the ground? Well, I'm not sure I agree that's what the video showed. But isn't that what the jury could determine the video shows? Well, if you ask me if a juror could, well, I can only go about what the video shows and I don't think a reasonable juror could reach that conclusion because as soon as he was down on the ground, Officer Reynolds laid the taser down which stopped the discharge to effectuate the arrest. So this wasn't a situation like you see in the cases where you've got someone who's prone on the ground and the taser discharge is continuing even while he's prone on the ground. Once he was on the ground, Officer Reynolds got down on the ground, stopped the taser discharge so he could effectuate the arrest. And so I don't think a reasonable juror could reach the conclusion that you suggested. I thought he did continue to tase him after he was on the ground. I have to go back and look at the video again, I guess. But I thought the tasing continued after he was on the ground. I don't believe the tasing continued after he was on the ground. If it was, it was just for Officer Reynolds to kneel down to lay the taser down so he could then effectuate the arrest. But in terms of him standing over him and tasing him while he's on the ground, like you see in some of the cases that plaintiffs cited, no, that did not happen. Would you like to address the expert quickly before your time expires? Yes, sir, Your Honor. With respect to the vocational rehabilitation expert, his opinions were not supported by medical evidence. We had five doctors who testified in this case and none of them testified that the plaintiff could not successfully complete college. None of them testified that he couldn't perform certain job related tasks and none of them testified that his brain injury would keep him from performing vocationally in any way in the future. As a matter of fact, plaintiff neuropsychologists testified that the plaintiff could complete college with accommodations and that he was above average intelligence. I have a question about your argument and maybe I'm not quite understanding it because it seems like the kinds of testimony that you're referring to, whether he could complete college, what he could do in a job, that is what a vocational rehab expert would be testifying to based on the medical evidence. But the way you presented it is that the medical doctor had to talk about whether he could go to college. Can you help clear that up for me? Sure. What you find in the case law is medical doctors have to testify to what the patient physically can and cannot do. And then based on what the doctors say the patient can and cannot do, the voc rehab experts then talk about the job prospects based on those limitations. In this case, there were no limitations testified to by the medical doctors at trial. They didn't testify that Bryce Masters couldn't perform A, B, C, D, and E. They didn't say he would be limited in he couldn't go to college in order for it to be admissible for the vocational expert to say that. Oh, I'm absolutely saying that because the neuropsychologist said that he could go to college. He could complete college. And so once the medical personnel say that he can complete college, you can't have a vocational rehab person coming back and contradicting the medical by giving his opinion because he doesn't have the qualifications to do that. And so and I understand this court reviews the district court has discretion on the admission of expert testimony. And I understand this court reviews that on an abuse of discretion standpoint. But once the medical personnel have said that or once there's no testimony that Bryce Masters has any limitations and the voc rehab expert then comes back and says, well, I have these opinions, some of which are contradictory to the medical testimony. Once that happens, the court loses discretion to allow that testimony. This vocational witness seemed to say, well, in my experience, the doctors say he can go to college, but in my experience, uh, it, it doesn't work out for people with brain injuries. That's just what he said. That's just what he said. And that's your best authority. What's your best authority that he's not qualified to say that, that he needs a doctor to say that it wouldn't work out. Is there any circuit authority or just these district court opinions that have been mentioned? The district court opinions that we cited in our brief, your honor, that's the authority that we have. I see my time is up. Very well. Thank you for your argument. Mr. Presley, we'll hear from you. May it please the court. Your honor, Kirk Presley for Bryce Masters. The reason Reynolds is not immune for continuing the taser beyond the initial five second deployment is the same reason he's not immune for throwing a handcuffed detainee face first into the concrete driveway. It is always a violation of the fourth amendments protections against unlawful seizures of the person to use gratuitous force when a detainee is not resisting. And let's look at the record as both judge Malloy and judge Colleton inquired on the facts of this case. If you look at the video, the taser is continuing to be deployed as Reynolds stands over Bryce Masters prostate on the ground saying I told you so for a period of 12 seconds. If you look at the stipulations of fact that were agreed to by the defendant. Paragraph 39, during the taser discharge, plaintiff did not attempt to hit, kick, or flee from Reynolds. Paragraph 40, during the taser discharge, plaintiff complied with all commands given by Reynolds. That is the basis for instruction 13, which judge Colleton inquired about, which says if you find the defendant Reynolds had a reasonable belief that plaintiff Bryce Masters was actively resisting arrest as the taser was discharged, that plaintiff was failing to comply, or defendant Reynolds continued the taser discharge unintentionally, your verdict must be in favor of defendant Reynolds. Now I have a question about that instruction. Why is reasonable belief of the officer a jury question? I understand why the facts of what happened are jury questions, but why isn't what a reasonable officer could believe a legal issue? The objectively reasonable officer is the legal issue. Then why was it submitted to the jury? This was submitted in addition to the requirements set forth in the verdict director, which is number 12, which specifically talks about the continued deployment of the taser into plaintiff's chest for 15 seconds. Tasers are a valuable, non-lethal method of force. We're not trying to take those out of officer's hands, but what officers are taught and trained and what Reynolds was taught and trained by the manufacturer itself is that every five seconds of charge, whether by trigger pull or continued deployment, has to be justified. Let me ask you a question about instruction 13. Was there any objection by either side to 13 and who tendered it, if you recall? It was tendered by defendant, I believe, and the court, I believe, and Keith will correct me in rebuttal if I'm wrong, but I believe that the court crafted 13 in and of itself. We did submit the verdict director number 12. However, we did not object to 13 as we believed it to be at that time, and a statement that was necessary for a finding of punitive damages down the road, because as the jury determined, Reynolds' use of both the taser and the drop were intentional and malicious. The irony of Appellant's argument at this juncture is that the taser didn't do what it was supposed to do. The taser with a dark probe mode shot at point blank range into the chest of a skinny 17-year-old kid is a violation of training in and of itself. The proper mechanism of utilizing the weapon would have been to use it in drive stun mode and just apply the pain compliance technique. I find it incredible that they want to say, well, the taser didn't incapacitate him when the whole point of Officer Reynolds' interaction was to get plaintiff to get out of the car, and yet he's using a device that is intended to reduce him to an inability neuromuscular incapacitation. That goes against his training. It goes against what an objectively reasonable officer would do. In fact, in the parade of his colleagues from the Independence Police Department that testified at trial, not a one justified his use of the taser in this application. There was no expert on the use of force propounded by Appellant Reynolds at any time during the trial. The only evidence at trial was the continued application of the taser was gratuitous force because Brice Masters challenged his authority. And that's always been unlawful. And that is from Graham versus Connor in 1989 forward, through Brown versus City of Golden Valley, all the way up until the most recent Jackson versus Stare, when the court bifurcated three separate tasering events and held that the middle one was not subject to qualified immunity. So we have to, by both training and the clearly established precedent in the taser context, we have to dissect the five second intervals of discharge. Because that's incredibly important here. Because it's that continued and prolonged deployment of the taser that, according to the manufacturer's own training, tells these officers when they are given this weapon, continued and prolonged discharges are to be avoided. And the reason they're to be avoided is so you and your department can avoid allegations of excessive force. That's exactly what they're told. So how can it not be clearly established that a gratuitous use of taser force is not a violation of Brice Masters' Fourth Amendment rights? What do you think of that statement by the district court that's in the addendum to the brief where the judge says, I believe it is not clearly established under the law that there is a period of time for which a taser can be deployed after a subject resists arrest. Do you think that's correct or incorrect? I think it's incorrect. Because once the resistance stops, the need for force stops. And you cannot rely on, well, we didn't know he could have continued resisting or he could have done something crazy. Jones has rejected that outright as being defective logic. That makes excessive force the default. So it cannot be used in a way that is gratuitous. The misdemeanant, a non-fleeing, non-resisting misdemeanant who's being pulled over for two tinted windows, that's the violation here. Two tinted windows is entitled to be free of gratuitous uses of force when he's chosen to comply and ceases resisting. You have to give him that opportunity. And the case law is clear across the circuits that once an initial application of force is used and resistance ceases and compliance begins, the need for continued force is abdicated. And so when that happens, otherwise, if you beat a guy with a baton and he says, okay, I give, I give, I'm on the ground, and then you just keep beating him and keep beating him, that's, that's a clear violation. That is a clearly established constitutional right to be free of that kind of excessive force. And that's exactly what we have here. The tasering is no different from dropping a handcuffed, semi-conscious young man, face first into the pavement. It was a, the jury found it to be, and while Reynolds' state of mind is irrelevant, again, we looked at the objective reasonable officer standard. What they found was not only was it not objectively reasonable, but that it was intentional and malicious, justifying an award of punitive damages. And so that, under our standard of review, those findings have to be taken as a given. All the evidence and all the inferences from the evidence must bend toward Brice Master's verdict and that it be upheld. And indeed, there's a dearth of evidence from the defendant, Reynolds, other than his own self-serving testimony that was clearly rejected in the face of the documented record in Exhibits 169 and 171, the video recordings of this entire event. When the jury heard the evidence and the deviations from training in the use of this taser, it became apparent, I mean, Reynolds knew better. He pulled it and then he holstered it and he thought, you know, that's not probably a good idea. All right. We've seen it on the video. But then Brice is like, what did I do wrong? What did I do wrong? With no answer. And so he's like, all right, F it. Here we go. You're riding the lightning, buddy. And you're riding it all the way to the ground. And I'm going to stand over you and administer it until I teach you a lesson. And that is the kind of conduct that aggravated this jury and that has led to the cultural climate in which we find ourselves today. And it is important that we recognize the jury's findings on each and every single issue in Brice Masters' favor. Not just the elements of the Fourth Amendment violation as set forth in Exhibit 12, but all the out the jury had. The trial court provided a window of opportunity far larger than the law requires to give the jury an opportunity to find in favor of defendant Reynolds. And it rejected that outright. This is not a close call. It was universally condemned by the public. It was charged by the U.S. attorney, both for the taser and the drop. It was recognized and Reynolds was indicted by a grand jury who held it was a violation of the record is the plea to the drop. That's what I thought, but you were arguing that the U.S. attorney's charging decision is relevant to the civil case. I'm saying that if there's objectively reasonable evidence of his conduct anywhere, then wouldn't a duty-bound prosecutor not take that into account? I was just asking whether what you're arguing is in the record. That's what I would address since this is an issue of law on whether or not the clearly established prong of QI applies is one for the court, then I think that's relevant on that inquiry. But more specifically, Judge Finner in his multiple rulings on QI, both before, during, and after trial, rejected qualified immunity. The manufacturer of the tasers, who specifically told Reynolds to avoid chest shots, to avoid point blank deployments, to avoid repeated prolonged or continuous discharges. Reynolds ignored all of that training to do what he wanted, to inflict a punishment on Bryce Masters. And because of that, and because that is a violation of Bryce's constitutional rights that were clearly established, your honor asked about the colloquy with the court through appellate's counsel. I will state that after that conference, we supplied the court with City of Painesville, Goodwin versus City of Painesville, which is the we could find on that issue. And we think provides this court with guidance from the Sixth Circuit. That was a 21-second application after a five-second drive-stun vote. And that is the nearest thing that we can find factually. But when it's an obviously clear violation to continue with Graduatus Force for a non-fleeing, non-resisting, misdemeanant detainee, who poses no security threat to Officer Reynolds, who was armed only with his cell phone camera, and who was seated in his vehicle. And so because of that, the finding by the jury as to the reprehensibility of Officer Reynolds' conduct on the drop, which even though it's the same legal analysis and even though it's the same legal principle, is that much more horrific than continuing to tase this young man into cardiac arrest, where he becomes pulseless, breathless, and suffers an anoxic event that his trauma surgeon testified was probably life-ending. It was not looking good. He appeared in the ER with posturing, and that's a sign of a significant, significant brain injury. And thanks to the care from Dr. Augustin, Bryce made a tremendous recovery, but he was still left with numerous deficits. The uncontested evidence from Dr. Arkin, his neurologist, and Dr. Price, his neuropsychologist, is that he suffered personality changes, emotional lability, he had difficulty with focus, executive function. That's what makes this so devastating to the Masters family, because Bryce was a smart cookie. He did have a high IQ, but it's his residual from actualizing his potential, and that is exactly what Mr. Dryling addressed in the VOC Rehab. He took those medical findings and then said, based on my experience, I've treated the head injury patients. I've treated people with these kinds of injuries. I've tried to get them to train into jobs that they can hopefully do, and it doesn't work out well. We didn't contend that Bryce was completely disabled. We only contended that he would not be able to make the kind of pursuits academically with the resulting increase in income stream that he should have. Could you address your cross-appeal just briefly in the last couple of minutes? On what basis, what's your best case, your best analogy, I guess, to why this ratio should go back to what the jury initially calculated? Well, what I think is probably most persuasive, and I think Judge Colleton alluded to this in an earlier case called, I think it's JBG. It's a company case where there were separate torts with separate punitive findings. It's the closest thing that I could find that is analogous, and that is this. The jury was given both these events in a single package. The jury deliberated and returned a unanimous collective verdict on the actual damages on both the drop and the brain injury at the same time. Subsequently, due to the bifurcation requested by Appellant Reynolds, the punitive aspect was likewise submitted in a single finding for the jury to parse out on the verdict form for each of the uses of force. Because the jury reached a unified event, I believe that the tasering and the drop in such close proximity are so inextricably intertwined that we should look at the ratio of the entirety of the actual damage award with the entirety of the punitive damage award. That ratio is a fraction. It's not even one-to-one. I told the jury in closing, your punitive award must be reasonable in relation to the actual damages. This was not a runaway jury. This was not a jury who was giving $100 million on an economic loss case. This was the physical injury and the reprehensible conduct. In the absence of any pecuniary loss to are identified, there can be no due process taking that serves as a punishment to him. Instead, it is a message to our community and to the officers who protect us that this was wrong. Okay. Your time has expired, but I have a question I'd like to ask you regarding drilling. Dr. Price, in her testimony, was asked, you're not saying that he cannot go to college, correct? And she said, correct. I'm not saying that he cannot go to college, though did recommend some accommodations at that time. What's the basis for saying that a vocational expert can then opine that the plaintiff cannot go to college? Two things about that. Number one is what Dr. Price's actual opinion was, was not that he could not go to college. It was that with a series of 12 accommodations that increased the probability of Bryce Master's success in the college environment. What Dr. Price did not have was Dr. Arkin's, the testifying neurologist, testimony about the nature and extent of his brain damage. Mr. Dryling had that as well. He had all of the medical evidence on the array of symptomology that persists after such a significant anoxic brain injury that it's a miracle this kid survived. And so because of that, he can take that medical finding and his interview with the patient, his interview with the parents, what are you experiencing? What problems does Bryce have? And he came to the conclusion, Bryce is probably doing what he's capable of, sweeping out Arrowhead Stadium. And he said, based on all of those factors and my experience in working with brain injured people, that's how I reached my opinion. And that is a recognized process. The concern is whether we have a risk here, if we affirm this, whether there's a risk that it authorizes vocational experts to essentially give medical opinions. The doctors are saying that the injuries do not preclude certain advancement, but a vocational expert can come in and say, well, in my experience, it does. Do you think that should be the law that I don't disagree with the doctors? Yeah, I don't. Here's the thing. Voc rehab experts do not express medical opinions. Mr. Dryling made that clear. Likewise, doctors do not have the requisite foundation to express voc rehab opinions. They can talk about what the physical disability is. I mean, in a common sense, is the ability of the plaintiff to go to college a vocational question or a medical question? It is. It is. You take the medical findings. You take a kid who, by the medical findings, has a good IQ, but who has executive function impairment, abstract reasoning, short-term memory impairment. He can't remember, as his mom testified, he can't remember that he's left his car running in the driveway. He can't find his keys. He's on his 35th cell phone. Those are the kinds of problems that make it difficult, if not impossible, for Bryce Masters to pursue a college degree. Could he do it? Yeah, I've seen TED Talks from people who sustained traumatic brain injuries who completed college. I've seen them complete advanced degrees, but it's the nature and extent of the residual symptoms that continue and will plague Bryce Masters for the rest of his life. Okay, thank you for addressing that. Appreciate it. Thank you, Judge Kalt. I thank the court for their time. Mr. Cutler, we'll give you a little extra time. I think you used your time originally, but we'll give you, say, three minutes for rebuttal and see if the court has any questions for you. Thank you, your honor. Just really quickly, this court addressed an issue in the Kelsey v. Ernst case back in, I believe it was 2019 and then just recently in, let me find it, about reasonable unreasonableness. And so, in this situation, if Officer Runnels was unreasonable, and we don't concede that he was, but if that's the jury's finding and if that's what the court is going to use as its basis, then if he was unreasonable, then it's up to the district court, not the jury, the district court to determine whether that unreasonableness was reasonable. And we submit that it was. And again, the Kelsey v. Ernst case and the Shelton v. Stevens case, in this case, this court just decided back in July. And so, again, with no bright lines being crossed here, this was a gray area. It was a power by Officer Runnels with respect to the tasing. So all of that, none of that is sufficient enough to take Officer Runnels out of the ambit of qualified immunity. Again, it's not something he has to earn. He is considered or considered to have qualified immunity unless he does something to take himself out of that. And it's up to the court. It's not a jury question. It is up to the district court to determine whether that unreasonableness was reasonably unreasonable. And we submit that it was. Can I ask just a quick question? Yes. As I understand it, you are not appealing any of the jury instructions though. You're not appealing instruction 13 or the verdict director. Is that correct? That is correct. I do want to address one thing that Mr. Presley mentioned. He talked about the current climate and police conduct. This happened in September of 2014. And so, Officer Runnels has to be judged by what the state of the law was back in September of 2014, not whatever the current tide is and what current political and social attitudes may be about qualified immunity. This is about what and whether that gave him sufficient notice that the use of the taser as he used it was unconstitutional. And we don't think it did. Okay. Thank you for your argument. Seeing no further questions, we appreciate both counsel presenting their arguments today. The case is submitted.